2006 WL 8431790
Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.

FINAZZLE CORPORATION USA, Plaintiff,
v.
FREEBAIRN & CO., Defendant.

CIVIL ACTION NO. 1:04-CV-3751-CC
|
Signed 09/28/2006

**Attorneys and Law Firms**

William Franklin Long, III, Erin Cranman Witkow, Sutherland Asbill & Brennan, Atlanta, GA, for Plaintiff.

David S. Fried, Scott Lester Bonder, Fried & Bonder, LLC, Atlanta, GA, for Defendant.

## ORDER

CLARENCE COOPER, UNITED STATES DISTRICT JUDGE

***1** Pending before the Court in the above-styled action are the following motions: (1) Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on Plaintiff's Claim for Declaratory Judgment of Non-Infringement and Defendant's Counterclaim for Copyright Infringement [Doc. No. 44]; (2) Defendant Freebairn & Co.'s Motion for Summary Judgment and Re-alignment of the Parties [Doc. No. 48]; and (3) Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on State Law Claims and Counterclaims [Doc. No. 52]. The Court heard oral argument on these motions on April 12, 2006. Having considered the arguments of the parties and having conducted a thorough review of the record, the Court hereby GRANTS Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on Plaintiff's Claim for Declaratory Judgment of Non-Infringement and Defendant's Counterclaim for Copyright Infringement, DENIES as moot Defendant Freebairn & Co.'s Motion for Summary Judgment, DENIES as moot Defendant Freebairn & Co.'s Motion for Realignment of the Parties, and DENIES as moot Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on State Law Claims and Counterclaims.

## BACKGROUND

### I. Facts

Plaintiff Finazzle Corporation USA ("Finazzle") is a small company in the business of developing and marketing specialty cleaning products, primarily grout cleaners and soap scum removers for kitchen and bathrooms. Finazzle distributes its products primarily through retail outlets such as grocery stores and has become one of the nation's fastest growing manufacturers of household cleaning products. Pete Finazzo is the founder and president of Finazzle.

Defendant Freebairn & Co. ("Freebairn") is a marketing and advertising agency. A relationship between Finazzle and Freebairn began around late 2003/early 2004, when Finazzle met with Freebairn to discuss the possibility of Freebairn developing a new logo for Finazzle. Freebairn began working on the logo on or about January 19, 2004. Freebairn provided Finazzle an estimate before beginning work on the logo, and Finazzle paid Freebairn in full for its work.

From mid-January 2004 to April 2004, Freebairn worked on several other creative jobs for Finazzle, namely, creating new labels or packaging designs for four Finazzle products, conducting consumer research for the creation of the labels, tagging existing Finazzle commercials with the logos for HEB, BiLo, Food Lion, and Winn Dixie grocery store chains, creating a promotional "Buyer Box" to present to the buyer for Target stores (a retail chain that Finazzle hoped would decide to carry its products), and maintaining and updating Finazzle's website. Freebairn would send Finazzle monthly invoices for the services performed in connection with these jobs, even if the jobs were not completed. For the more expensive jobs, such as the creation of the logo, the creation of the labels, and the packaging research, Freebairn provided Finazzle with an estimate. At times, Freebairn outsourced some of this work to third parties. However, Freebairn informed Finazzle before doing so.

***2** Freebairn charged Finazzle a total of $31,811.00 for the following creative services: creating new labels for four Finazzle products, conducting consumer research for the creation of the labels, tagging existing Finazzle commercials with logos for HEB, BiLo, Food Lion and Winn Dixie grocery store chains, creating a promotional "Buyer Box," and maintaining and updating Finazzle's website. Finazzle paid Freebairn a total of $33,293.00 for these services. [1] Freebairn admits that Finazzle paid it in full for its creation of the four packaging designs or labels for Finazzle.

On February 11, 2004, Pete Finazzo met with John Freebairn, Jean Cobb, and Mack Kirkpatrick of Freebairn. Although Freebairn had already commenced creative work that had been specifically authorized by Finazzle, it was not until this meeting that a written agreement was first discussed. Specifically, Freebairn presented a document entitled "Service and Compensation Agreement" to Mr. Finazzo, who indicated he would review the document at a later time. Among the terms of this document was a provision that allowed Freebairn to charge a $3,000.00 monthly retainer fee. Despite the fact that Mr. Finazzo did not receive a copy of this written document until February 11, 2004, which he did not even read at that time, Freebairn had begun billing Finazzle this monthly fee of $3,000.00. Specifically, Freebairn sent Finazzle invoices for $3,000.00 on January 12, 2004, and February 10, 2004. The invoices stated only that this fee was for "Agency Compensation." Mr. Finazzo paid these two invoices, but he contends he paid them because he thought they represented interim charges for the creative services partially performed by Freebairn to date. Jean Cobb of Freebairn had informed Mr. Finazzo that Finazzle would be billed on a "progressive" basis (i.e., Freebairn would bill as the work is done and would not wait until a job is completed). Freebairn contends that Mr. Finazzo knew Freebairn was charging a monthly "Agency Compensation" fee but paid the invoices without objection or notation nonetheless.

After the parties' February 11, 2004 meeting, Freebairn contacted Mr. Finazzo because he still had not signed the document entitled "Service and Compensation Agreement." During this conversation, Mr. Finazzo again represented that he had not read the document. After that conversation, Freebairn never contacted Finazzle again regarding the document. Moreover, Finazzle never executed a copy of the document, although Freebairn did.

In or about mid-February 2004, Finazzle agreed to allow Freebairn to place its existing television commercials with television stations in specific markets, in exchange for a 15% commission. Previously, Mr. Finazzo had been handling the task of media placement himself, but he agreed to allow Freebairn to take over based on Freebairn's expertise (i.e., its claimed ability to obtain better pricing and its relationship in the market). Freebairn acknowledges that skill is required to place television commercials.

Freebairn was made aware of how Mr. Finazzo previously placed media buys, but the parties disagree as to whether Finazzle dismissed those parameters and agreed to the parameters suggested by Freebairn for the buys. Finazzle contends that there was an oral agreement between the parties that required Freebairn to place the commercials such that they would be broadcast at the same time during a show each day. Mr. Finazzo cannot recall a specific date or time when he began discussing media placement with Freebairn. Nor can Mr. Finazzo recall the specific date on which Finazzle and Freebairn entered into this oral agreement. He does, however, recall discussing timing with Freebairn and mandatory placement of the advertising that would run during the same breaks of the programs each day. Mr. Finazzo believes he expressed the parameter that shows run at the same time every day verbally to Freebairn. According to Finazzle, this meant Mr. Finazzo wanted Finazzle's commercials placed or run during the first inside break and the last inside break of a show. More specifically, this meant Mr. Finazzo wanted Finazzle's commercials run in the first grouping of commercials after a show started and the last grouping of commercials before the show

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

ended. Mr. Finazzo does not have a direct recollection of a specific day where he discussed this parameter with Freebairn, but he does have a vague recollection of reiterating this principal to Freebairn many times.

***3** Sandy Chapman, Freebairn's Vice President—Media Director, recalls that Mr. Finazzo casually mentioned at their first meeting that when running advertising, he liked the first break in shows. Ms. Chapman does not recall Mr. Finazzo insisting that the advertisements be placed in the first break of shows. Ms. Chapman recommended to Mr. Finazzo that instead of concentrating on an individual show, it was more efficient to spread the budget around other networks to avoid losing audience. She recommended that the schedule not target specific breaks. Ms. Chapman recalls that Mr. Finazzo approved the recommendation, but Finazzle relies on Mr. Finazzo's deposition testimony to dispute that it approved any alleged recommendation by Ms. Chapman or any other Freebairn employees that Finazzle not air its commercials during specific commercial breaks.

Jean Cobb, Freebairn's Vice President—Account Director, was present at a meeting during which Freebairn discussed Finazzle's practice of purchasing media during the same breaks of shows. According to Ms. Cobb, Mr. Finazzo agreed with Freebairn's recommendation that he could reach more people more efficiently if he spread his budget and did not purchase commercials during the same breaks of a show.

John Freebairn, Freebairn's President, had numerous conversations with Mr. Finazzo in which they discussed the enormous expense of Finazzle's previous practice of purchasing commercials during the same break. Mr. Freebairn outlined how Freebairn makes purchases and how Finazzle's purchases could be done more efficiently. Mr. Freebairn explained to Mr. Finazzo that he could have more reach and more frequency delivered to more audience for less money if he deviated from Finazzle's prior practice. Mr. Freebairn also recalls that Mr. Finazzo agreed to deviate from his prior practice and that he gave approval to Freebairn to conduct the buys as they did.

Finazzle signed two Media Purchase Authorizations (“MPAs”), under which Finazzle authorized Freebairn to place $407,800.00 of media in Virginia, Maryland, and Washington, D.C. and $76,281.00 in South Carolina on Finazzle's behalf. Both MPAs specifically provided that Finazzle was permitted to cancel the advertising that had not yet run in accordance with station cancellation policies. Mr. Finazzo read each MPA specifically but did not thoroughly read them. Finazzle concedes that both MPAs are contracts.

Finazzle signed MPA No.: FNTV01 on March 25, 2004. The markets for this MPA include Charleston, Columbia, and Greenville, South Carolina. The MPA authorizes Freebairn to buy the number of spots indicated on any of the shows indicated in the contract. This MPA also provides a budget for the purchase. MPA No.: FNTV01 identifies the length of the flight, or the time period during which the commercials would run. The MPA does not indicate any specific time slots for placement of the commercials. When Mr. Finazzo signed MPA No.: FNTV01 on Finazzle's behalf, he understood that the purchase would yield Freebairn a 15 % commission. Finazzle contends that the MPA does not represent the parties' complete agreement.

Freebairn sent a memo to Finazzle dated March 31, 2004, regarding MPA No.: FNTV01. The memo specifically identifies the schedule prepared by Freebairn regarding the markets, shows, and number of spots to be run. When presented with the memo during his deposition, Mr. Finazzo testified he would have never structured the media placement in the manner in which it was set forth in the memo. Mr. Finazzo admits that he never contacted Freebairn to object to the schedule, but Mr. Finazzo does not have a direct recollection of seeing the memo.

Finazzle signed MPA No.: FNTV02 on March 31, 2004. This MPA authorizes Freebairn to purchase commercial spots in the Virginia/Maryland markets for a period of 6 weeks beginning April 12, 2004, on any of the shows indicated in the contract. This MPA also provides a budget for the purchase, and Mr. Finazzo understood that the gross total included a 15% commission that would be owed to Freebairn once the flight was completed. The document, however, makes no mention of a 15% commission.

***4** During discovery, Finazzle produced two memos from Freebairn regarding MPA No.: FNTV02 dated April 1, 2004, and April 27, 2004, respectively, and identified during Mr. Finazzo's deposition as D-21 and D-22. The memos identify with

specificity the schedules for the flights, including the shows on which Finazzle's commercials would run and the number of spots in each market. Mr. Finazzo admits that he probably saw the memos, but he does not have a specific or direct recollection of seeing them. Mr. Finazzo testified that if he did see the memo dated April 1, 2004, he shot it down. However, Mr. Finazzo does not recall calling Freebairn at any time to object to the memo. He testified that if Freebairn had given him the memo, he would have automatically objected to the memo because the schedule therein presented "way too thin of a spread of spots." (Deposition of Pete Finazzo "Finazzo Dep." at p. 286.) Mr. Finazzo similarly testified that he would have shot down immediately the memo dated April 27, 2004, but he did not recall shooting down this particular memo. Mr. Finazzo admitted that both memos might have been in his possession but that he may have never read them.

Finazzle believes Freebairn breached the parties' alleged oral agreement because the advertisements were not placed according to the verbal parameters Mr. Finazzo placed on the buys. Mr. Finazzo cannot specifically recall any spots that were not placed in the fashion he directed, but he remembers looking at affidavits he received from the television stations and seeing that the commercials were not broadcast in accordance with his parameters. Specifically, according to Mr. Finazzo, the affidavits show that the commercials were run at all different times every day scattered throughout the day.

Finazzle maintains that Freebairn breached the parties' verbal agreement also by outsourcing the task of media placement to a third party, CTV Media, Inc. ("CTV"), which acted as Freebairn's agent. Freebairn disputes this contention and argues that, although CTV assisted in the media buys, Freebairn stayed actively involved in the substantial amount of work necessary to complete the buys. Ms. Chapman, who was in charge of the media planning and supervising the buying of media on Finazzle's account, spent substantial time executing the media buys. In particular, Chapman reviewed the objectives for the media purchase campaign, conducted research on the types of people who would buy Finazzle's product, identified the customers' media usage habits, made recommendations as to appropriate media and programming, and set all parameters for the media buys. Chapman also generated research reports, comparison sheets for various buys, recaps of the purchases, and memos to Finazzle. Finally, Chapman supervised the purchase of all media on Finazzle's behalf, which involved setting the programs that Freebairn would buy, identifying and setting the levels at which they would buy, setting the number of spots to buy, researching which television markets would best cover a store area for the buy, setting the budget, setting expectation for savings, reach and frequency of the buys, and reviewing every buy.

Mr. Finazzo personally is unaware of how much work Freebairn performed in connection with the media placement, but there are documents in the record showing that CTV created the schedules of television shows on which Finazzle's commericals would run, CTV negotiated the rates with the television stations, and CTV was the primary contact with the television stations. Freebairn never obtained Finazzle's consent or authorization prior to involving CTV in making the media buys. To the contrary, steps were taken to ensure that Finazzle did not find out that Freebairn had involved CTV. Still, relying on Mr. Finazzo's deposition testimony, Freebairn asserts that there was never any discussion between Finazzle and Freebairn about outsourcing any of the media work and Finazzle never prohibited Freebairn from outsourcing work. According to Mr. Finazzo, he never had such a discussion with Freebairn because he was not even aware that it was possible for Freebairn to outsource the work.

***5** In April and May of 2004, Finazzle requested that Freebairn provide affidavits from the television stations indicating the precise times at which Finazzle's commercials were being aired. Freebairn failed to provide the documentation. Mr. Finazzo testified that he ultimately learned that Freebairn had outsourced its duties to CTV without Finazzle's authorization or consent. According to Mr. Finazzo, Finazzle would have never authorized Freebairn to use a middleman to place its advertising. Accordingly, on May 27, 2004, Finazzle contacted each television station and requested that they send Finazzle an affidavit that included a record of which spots ran with the exact times and dates. At the same time, Freebairn contacted each television station and requested that the advertising placed by CTV be cancelled.

Upon receipt of the affidavits from the television stations, Finazzle paid the stations amounts owed for the advertising placed by CTV, an amount no less than $110,937.00. Finazzle paid Freebairn $16,668.90 in commissions. Finazzle also paid $2,733.00 for Freebairn's commissions directly to certain television stations—WYFF, WUSA, and WTVR (Raycom). Finazzle informed

Freebairn that it would need to collect these commissions directly from the stations, as the invoices sent to Finazzle by these stations did not break out the amount of agency commission.

Freebairn contends that Finazzle was obligated to pay Freebairn a 15% commission for the entire dollar amount set forth in the MPAs (i.e., $72,612.15 [15% of $407,800.00 + $76,281.00] ), even if a portion of that media was cancelled before it aired. The MPAs and the "Service Compensation Agreement" expressly contemplate that Finazzle may cancel media prior to its broadcast. Freebairn also admits that Finazzle was permitted to cancel media prior to its broadcast. However, the parties disagree as to whether the "Service Compensation Agreement" contains a provision that obligates Finazzle to pay Freebairn a commission for cancelled commercials.

As part of the placement of Finazzle's television commercials, Freebairn advanced $17,255.00 to National Cable Communications ("NCC") on Finazzle's behalf. Finazzle admits that Freebairn is entitled to offset the amount of damages owed to Finazzle by the amount Freebairn advanced to NCC on Finazzle's behalf.

In or about February 2004, Freebairn and Finazzle began discussing Finazzle's desire to create new television commercials. Following the discussion, Freebairn began to develop concepts for these television commercials. Specifically, on February 11, 2004, Freebairn began working to come up with concepts for Finazzle's kitchen grout cleaner product. Freebairn created approximately six to eight storyboards for the purpose of presenting television commercial ideas to Finazzle for its grout cleaner product.

Among the storyboards created for Finazzle's kitchen grout cleaner product were two versions of a storyboard depicting a woman using a jackhammer on her kitchen tile floor (collectively referred to herein as the "Jackhammer Storyboards"). This concept is based on a telephone message Finazzle received from one of its customers in 1994. In the message, the customer states the following: "... I have a kitchen tile floor, which I hate it. It has ground in dirt which would not come out. I have used everything on the market, and I found this one Saturday and used it. That was the last thing I was going to try, and I was going to jackhammer the floor up...." Teresa Roth at WSB-TV produced a television commercial in 1999 for Finazzle in which this testimonial is played during a product demonstration of Finazzle's grout cleaner product. This commercial aired in 1999. Freebairn viewed and heard this testimonial commercial before it created the Jackhammer Storyboards. Freebairn admits that it obtained the concept of a woman using a jackhammer from Finazzle's testimonial commercial.

***6** The storyboards for Finazzle's kitchen grout cleaner were presented to Finazzle on March 17, 2004. At this presentation, Finazzle informed Freebairn that it was not in the position to actually produce any commercials at that time. Finazzle also informed Freebairn that the first commercial that it would produce, when it decided to produce one, would be for its soap scum remover product, as that was its newest product. In or about March 2004, Freebairn began working on generating ideas for television commercials for Finazzle's soap scum remover product. To present these concepts to Finazzle, it created additional storyboards reflecting these ideas.

In total, Freebairn created eleven (11) storyboards for Finazzle's kitchen grout cleaner and soap scum remover products. Freebairn never provided Finazzle with an estimate for its work on storyboards. However, one of Freebairn's employees, John Wieschhaus, testified that it was Freebairn's common procedure to provide customers with estimates before beginning work on a project. Prior to billing Finazzle, Freebairn never communicated to Finazzle how much money it was actually spending to create the storyboards. Yet, Freebairn was aware that Finazzle had expressed sensitivity to costs and had been surprised at the cost of some of the jobs. Indeed, Mr. Finazzo communicated to Freebairn that he did not want to spend a lot of money on a television commercial and that he would like to produce a television spot for no more than $10,000.00.

After the storyboards were presented to Mr. Finazzo, Mr. Finazzo invited Freebairn to present the concepts to Publix, a major buyer in Florida because Mr. Finazzo thought Freebairn "earned the opportunity to sell his concepts." (Finazzo Dep. at p. 162.) Freebairn then presented the concepts to Publix on Finazzle's behalf. One month later, immediately after the parties' relationship

terminated, Publix contacted Mr. Finazzo and told him they were interested in the "Jackhammer" concept and authorized him to produce a commercial.

Despite the fact that Freebairn performed work on the storyboards in February 2004, it did not issue Finazzle an invoice in February for the work that was completed on the storyboards that month, nor did it sent Finazzle an invoice for the storyboard work in March, April, or May of 2004. When the parties' relationship terminated in late May of 2004, Freebairn did not communicate to Finazzle at that time that Finazzle would need to pay Freebairn for its work on the storyboards. Freebairn finally sent Finazzle an invoice for $77,000.00 for the storyboards on October 29, 2004. This invoice, however, was not entered into Freebairn's accounting system.

When the parties' relationship terminated in late May of 2004, Finazzle was in possession of some of the storyboards created by Freebairn. However, Freebairn maintained the original digital versions of all eleven storyboards. Finazzle never refused to return the storyboards. On March 3, 2005, Finazzle's counsel informed Freebairn's counsel that he was welcome to retrieve the storyboards from Finazzle's counsel at any time. Freebairn's counsel never responded to this written offer. Ultimately, Finazzle produced the original storyboards to Freebairn in late April of 2005, as they were responsive to discovery requests served by Freebairn. The storyboards were not damaged in any way at the time they were returned to Freebairn's counsel.

In the summer of 2004, Mr. Finazzo met with Teresa Roth, Brandi Harrison, Steve Brown, and Preston Hobson of WSB-TV regarding the production of new television commercials for Finazzle's kitchen grout cleaner and soap scum remover product. Mr. Finazzo indicated that he was interested in shooting new commercials on film, as his previous commercials were shot on video. Ms. Roth at WSB-TV had produced television commercials for Finazzle in the past, including the original commercial playing the "Jackhammer" testimonial.

***7** In their initial meeting, Mr. Finazzo brought with him and showed a storyboard. However, neither Teresa Roth nor Brandi Harrison of WSB-TV, the individuals responsible for the production of the commercial, ever saw the Jackhammer Storyboards created by Freebairn, nor did they know the Jackhammer Storyboards existed prior to the present litigation.

During the meeting, the WSB-TV advertising staff came up with two concepts for television commercials: (i) one commercial for Finazzle's kitchen grout cleaner, based on the "Jackhammer" concept depicted in Finazzle's 1999 commercial (the "Jackhammer Commercial"); and (ii) one commercial for Finazzle's soap scum remover that would depict a woman being forced to wear a hazardous materials suit because of the fumes created by competing soap scum removers. The Jackhammer Commercial was based on the testimonial commercial produced by WSB-TV in 1999. These two commercials were actually shot in mid to late 2004. With respect to the Jackhammer Commercial, Mr. Finazzo testified in his deposition that he directed the whole thing.

Freebairn contends that Finazzle's Jackhammer Commercial infringes its copyright in the Jackhammer Storyboards it created. Freebairn's Counterclaim alleges that the other commercial created by WSB-TV, depicting a woman in a hazardous materials suit, infringes its storyboard entitled "Laboratories," depicting a man wearing a hazardous materials suit. During this litigation and at the summary judgment hearing, Freebairn conceded that it is not making a claim of infringement with respect to the "Laboratories" storyboard. Rather, the only storyboards Freebairn contends were infringed are the Jackhammer Storyboards.

Freebairn contends the following similarities exist between the Jackhammer Commercial and the Jackhammer Storyboards: (1) both works are demonstration commercials; (2) both works are 30-second commercials; (3) both works use voiceover announcers with bright, happy music; (4) both works have the same concept of a woman in a kitchen with a jackhammer; (5) both works use the same chronology—woman does business with an apron, appears in kitchen with a jackhammer; (6) both open with an element of intrigue/mystery; (7) both have a woman grabbing a handle as part of the action; (8) both use the element of surprise and incongruity by having a woman suddenly appear with a jackhammer to clean the grout of her tile kitchen floor; (9) both have the woman appear in the kitchen wearing a yellow hard hat and construction work clothes; (10) both have the woman in the yellow hard hat with the jackhammer appear in kitchens with similar configurations—both kitchens have an island at the right of the frame; (11) both use sound effects featuring the loud, obtrusive sound of a jackhammer; (12) both show

a close-up shot of the product; (13) both demonstrate the product at work; (14) both show the same camera angle and action in the use of a cleaning brush; (15) both show the same camera angle and close-up shot of the cleaning action; (16) both show the same woman's position in cleaning the tile floor; (17) both show a closing shot with the Finazzle bottle in the foreground in the kitchen; and (18) both end with "Make it Dazzle with Finazzle."

Freebairn has admitted that television commercials are "generally produced in 15, 30, or 60 second lengths." Freebairn has admitted that it is not unusual for women to wear aprons in kitchens. Freebairn has admitted that the use of a product demonstration in a commercial is not original to Freebairn. Moreover, the product demonstration depicted in the Jackhammer Commercial is the same product demonstration that Finazzle was using in its commercials prior to its relationship with Freebairn, and WSB-TV intentionally mimicked that demonstration when producing the Jackhammer Commercial. Freebairn has admitted that the use of a close-up of the product at the end of a commercial is not original. Finazzle was ending its commercials with a close-up of the product prior to its relationship with Freebairn. The use of a voiceover announcer or "bright, happy music" is not original to Freebairn. Finazzle was using a voiceover announcer, as well as bright, happy music in its television advertising prior to its relationship with Freebairn. Finally, the female character depicted in the Jackhammer Storyboards was meant to look like a character from a "50's sitcom," like "June Cleaver or someone like that."

***8** Freebairn alleges that Finazzle breached the document entitled "Service and Compensation Agreement" by failing to pay Freebairn $24,000.00 for eight months worth of the $3,000.00 monthly "account management" fee. Freebairn also alleges that Finazzle is obligated to pay Freebairn $77,000.00 for its work in creating the eleven (11) storyboards pursuant to an oral agreement or, alternatively, under various equitable doctrines. Freebairn also alleges that Finazzle is obligated to pay Freebairn $72,612.15 in commissions earned for the entire dollar amount set forth in the Media Purchase Authorizations (15% of $407,800.00 + $76,281.00), even though not all of that media was actually broadcast. Freebairn contends that Finazzle owes Freebairn $108,811.10 for various creative services performed by Freebairn. Freebairn contends that Finazzle failed to pay Freebairn $20,300.00 for an amount advanced on Finazzle's behalf for the purchase of media. Finazzle has paid Freebairn a total of $49,962.22.

**II. Procedural History**

Finazzle commenced this action against Freebairn on December 23, 2004, seeking a declaratory judgment of non-infringement of copyright and non-breach of contract. On January 5, 2005, Finazzle filed a First Amended Complaint, adding a claim for breach of contract. On February 11, 2005, Freebairn filed its Answer to Finazzle's First Amended Complaint and also filed a Counterclaim. The Counterclaim consists of six counts: (1) breach of contract; (2) unjust enrichment; (3) quantum meruit and quantum valebat; (4) conversion; (5) copyright infringement in violation of 17 U.S.C. § 501, et seq.; and (6) attorneys fees and expenses of litigation. Finazzle replied to Freebairn's Answer and Counterclaim on March 7, 2005. As stated supra, the parties' summary judgment motions are presently pending before the Court.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986).

The moving party bears the initial burden of asserting the basis of its motion, and that burden is a light one. See Celotex, 477 U.S. at 323. The movant is not required to negate its opponent's claim. See id. Rather, the movant may discharge this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. 

moving party's case." Id. at 325. When this burden is met, the non-moving party must then "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' " Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, see Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987), that party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986). The non-moving party must come forward with specific facts showing there is a genuine issue for trial. See id. at 587. Substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element essential to its case, so as to create a genuine issue for trial. See Celotex, 477 U.S. at 323; Rollins, 833 F.2d at 1528.

## MOTIONS FOR SUMMARY JUDGMENT

### I. Finazzle's Motion for Summary Judgment on Plaintiff's Claim for Declaratory Judgment of Non-Infringement and Defendant's Counterclaim for Copyright Infringement

***9** Finazzle seeks summary judgment on Count I of its First Amended Complaint, which is for Declaratory Judgment of Non-Infringement, and on Freebairn's counterclaim for copyright infringement. Finazzle argues that the commercials produced after its relationship with Freebairn terminated do not infringe the Jackhammer Storyboards and that it is therefore entitled to a declaration stating the same. [2] Freebairn asserts that Finazzle's request for summary judgment should be denied.

"[N]on-infringement may be determined as a matter of law on a motion for summary judgment either because the similarity between two works concerns only non-copyrightable elements of the [work alleged to be infringed], or because no reasonable jury, properly instructed, could find that the two works are substantially similar." See Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1247 (11th Cir. 1999). To prove copyright infringement with respect to the Jackhammer Storyboards, Freebairn bears the burden of proving that Finazzle copied constituent elements of the Jackhammer Storyboards that are original. [3] See id. Copying can be established by demonstrating that the alleged infringer had access to the copyrighted work and that the works are "substantially similar." See Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994). For purposes of this summary judgment motion, Finazzle concedes that the creators of the Jackhammer Commercial had access to the Jackhammer Storyboards created by Freebairn. Finazzle argues that it is entitled to summary judgment because the only similarities between the works are non-copyrightable elements and also because no reasonable jury, properly instructed, could find that the Jackhammer Commercial is "substantially similar" to the Jackhammer Storyboards.

Freebairn must satisfy a two-pronged test to establish substantial similarity: an extrinsic, or objective, test and an intrinsic, or subjective, test. Herzog, 193 F.3d at 1257. A "[party] who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994). While the Ninth Circuit considers only the extrinsic test at the summary judgment stage, Eleventh Circuit law permits the Court also to grant summary judgment based on a party's failure to satisfy the intrinsic test. Herzog, 193 F.3d at 1257 ("A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work *or* if no reasonable jury would find that the two works are substantially similar.") (emphasis in original).

"Under the extrinsic test, a court will inquire into whether, as an objective matter, the works are substantially similar in protected expression." Herzog, 193 F.3d at 1257. In making this inquiry, the court looks to see "whether a [party] seeks to protect only uncopyrightable elements; if so, the court will grant summary judgment for the defendant." Id. "The extrinsic test is an objective test based on specific expressive elements: the test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in two works." Kouf, 16 F.3d at 1045 (citations omitted); see also Beal, 20 F.3d at 460; Herzog, 193 F.3d at 1257. The Court "must take care to inquire only whether '*the protectible* [sic] *elements, standing*

*alone*, are substantially similar.' " Williams v. Crichton, 84 F.3d 581, 588 (2d Cir. 1996) (quoting Knitwave, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995) (emphasis in original)). "Therefore, when applying the extrinsic test, a court must filter out and disregard the non-protectible [sic] elements in making its substantial similarity determination." Cavalier v. Random House, Inc., 297 F.3d 815, 823 (9th Cir. 2002). If all of the claimed elements of similarity are unprotectable, it is axiomatic that the extrinsic test cannot be satisfied. Herzog, 194 F.3d at 1257.

***10** In the instant case, Finazzle first argues that Freebairn cannot establish substantial similarity under the extrinsic test. Finazzle argues that there is no similarity of protectable expression between the plots of the works, as the only similarity between the works is the idea of a woman using a jackhammer on her kitchen floor to clean grout, which is not protectable both because the idea came from Finazzle and because ideas are not protectable. As to the sequence of events of the works, Finazzle argues that there is no similarity of protectable expression because, inter alia, the Jackhammer Commercial employs many more frames and much more detail than the Jackhammer Storyboards and the opening and closing frames of the Jackhammer Commercial differ from the opening and closing frames of the Jackhammer Storyboards. With respect to the dialogue of the works, Finazzle argues that the dialogue and sound effects of the works are completely dissimilar because the Jackhammer Storyboards read that the commercial opens with "bright, happy music, like a 50's sitcom," while the Jackhammer Commercial opens with the electronic-sounding music and a man's voice stating the following: "Using machinery in the home can pose a serious risk. Wear high protection and take other precautions, and above all else...." In the Jackhammer Commercial, the man's voice trails off into a woman's voice stating the following, again over the sound of electronic music:

> Are you ready to use a jackhammer on your stained tile floor? Then try Finazzle Grout Cleaner. Watch how Finazzle penetrates deep to lift out this hardened build-up. And look! This isn't an exaggerated before and after shot. This is Finazzle actually at work on real tile and grout. It leaves your tile clean and fresh with no fumes. When it comes to cleaning your tile floors, make it dazzle with Finazzle!

In contrast, the script of the Jackhammer Storyboards reads as follows: "If you've tried everything to clean the grout in your tile, smile ... Because Finazzle is so easy. Just spray on ... Brush in, wipe-off. Let the hardest working grout cleaner ... do the dirty work for you. Make it dazzle with Finazzle." As to the setting of the works, Finazzle argues that there is no similarity of protectable expression because, although both the Jackhammer Commercial and the Jackhammer Storyboards are set in a kitchen, the kitchens are substantially different. That is, the kitchen in the Jackhammer Storyboards is not modern or upscale, while the kitchen depicted in the Jackhammer Commercial is meant to be modern and upscale, as it has, inter alia, tan ceramic tile floor, tan walls, brown wood cabinets, and a gray countertop. The characters of the works, Finazzle argues, are also dissimilar. While both works show a woman in a kitchen, the woman in the Jackhammer Storyboards has blond hair, styled in a 50's-style bob hair style and was intended by Freebairn to look like a character from a 50's sitcom. On the other hand, the woman in the Jackhammer Commercial has a more modern appearance. She has long, dark-brown hair in a modern hairstyle. Finazzle also points out that the clothes worn by the women are also very different. As to the mood and pace of the works, Finazzle only addresses the mood of the works because the Jackhammer Storyboards do not indicate a pace. With respect to mood, however, Finazzle contends that the element of surprise upon which Freebairn relies to show similarity in mood is no more than a reiteration of the general idea of a woman using a jackhammer on her kitchen floor. To the extent that there is an element of "surprise," Finazzle contends that the surprise in the two works is different. According to Finazzle, the surprise with respect to the Jackhammer Storyboards is that the woman is using a jackhammer, whereas the surprise in the Jackhammer Commercial is that the woman is in her kitchen, not that she is using a jackhammer. Finally, Finazzle argues that there is no similarity of protectable expression with respect to any other alleged similarities, such as the fact that both works are 30 second commercials and that both works use voiceover announcers with bright, happy music supports. Thirty-second commercials and the use of voiceover announcers, Finazzle argues, are common and not original to Freebairn.

Finazzle next argues, albeit briefly, that Freebairn also cannot satisfy the intrinsic test for copyright infringement. The intrinsic test is a subjective test focusing on "whether, upon proper instruction, a reasonable jury would find that the works

are substantially similar." Herzog, 193 F.3d at 1257. While Finazzle acknowledges that the Jackhammer Storyboards and Jackhammer Commercial are likely to be viewed as similar to a certain degree by virtue of the fact that the commercial is only thirty (30) seconds in length, Finazzle contends that all of the differences between the works mentioned above would preclude a reasonable jury from finding that the works are substantially similar.

***11** In response to Finazzle's summary judgment motion, Freebairn argues that the Jackhammer Commercial and the Jackhammer Storyboards are similar because they both employ the concept of a woman using a jackhammer. Freebairn curiously asserts that this concept is an original work belonging to it, but there is no dispute that Freebairn obtained the concept of a woman using a jackhammer on her kitchen floor from a commercial Finazzle produced prior to its relationship with Freebairn. Freebairn argues that the commercial was simply one demonstrating Finazzle's product with a voiced-in testimonial tagged on to the end. This does not change the fact, however, that the concept of a woman using a jackhammer was not an original idea of Freebairn's but was a concept taken from the commercial that Finazzle had previously aired. In any event, the concept of a woman using a jackhammer is not protectable. Herzog, 193 F.3d at 1248 ("It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself."). The Court assumes therefore from Freebairn's additional discussion that it contends the expression of the concept is an original work, rather than the concept itself.

Freebairn next argues that whether the works are substantially similar is an issue for the jury. However, this argument flies in the face of the numerous cases that have held that non-infringement may be decided on summary judgment. See, e.g., Beal, 20 F.3d at 459; Herzog, 193 F.3d at 1247; accord Stromback v. New Line Cinema, 384 F.3d 283, 294 (6th Cir. 2004); Yankee Candle Co. v. Bridgewater Candle Co.,259 F.3d 25, 37 (1st Cir. 2001); Kregos v. Associated Press, 3 F.3d 656, 663 (2d Cir. 1993); Shaw v. Lindheim, 919 F.2d 1353, 1355 (9th Cir. 1990); Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir. 1987); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980). The Court acknowledges that summary judgment is not highly favored on questions of substantial similarity in copyright cases. Shaw, 919 F.2d at 1355. However, summary judgment may still be appropriate "if no reasonable jury could differ in weighing the evidence." Leigh v. Warner Bros., 212 F.3d 1210, 1216 (11th Cir. 2000).

Notwithstanding its expression of doubt as to whether the Court should undertake to determine whether the works are substantially similar, Freebairn contends that there are numerous similarities between the Jackhammer Commercial and the Jackhammer Storyboards, including specifically the following: (1) both works are demonstration commercials; (2) both works are 30-second commercials; (3) both works use voiceover announcers with bright, happy music; (4) both works have the same concept of a woman in a kitchen with a jackhammer; (5) both works use the same chronology—woman does business with an apron, appears in kitchen with a jackhammer; (6) both open with an element of intrigue/mystery; (7) both have a woman grabbing a handle as part of the action; (8) both involve a camera pulling back to reveal a woman on a jackhammer; (9) both use the element of surprise and incongruity by having a woman suddenly appear with a jackhammer to clean the grout of her tile kitchen floor; (10) both have the woman appear in the kitchen wearing a yellow hard hat and construction work clothes; (11) both have the woman in the yellow hard hat with the jackhammer appear in kitchens with similar configurations—both kitchens have an island at the right of the frame; (12) both use sound effects featuring the loud, obtrusive sound of a jackhammer; (13) both show a close-up shot of the product; (14) both demonstrate the product at work; (15) both show the same camera angle and action in the use of a cleaning brush; (16) both show the same camera angle and close-up shot of the cleaning action; (17) both show the same woman's position in cleaning the tile floor; (18) both show a closing shot with the Finazzle bottle in the foreground in the kitchen; and (19) both end with "Make it Dazzle with Finazzle."

Lists, however, "are inherently subjective and unreliable." Leigh, 212 F.3d at 1215; Beal, 20 F.3d at 460. A "listing of similarities does not alone generate an issue of material fact precluding summary judgment." Hartman, 833 F.2d at 120. Rather, the Court must analyze the list to filter out the unprotectable elements such as ideas, *scenes a faire*, and non-original elements. See Swirskey v. Carey, 376 F.3d 841, 845 (9th Cir. 2004) ("Because the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a [party's] work") (emphasis in original); Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp., 361 F.3d 312, 325 (6th

Cir. 2003) ("[t]he canonical statement of law is that *non-protectible elements* must be filtered out") (emphasis in original); Williams, 84 F.3d at 588 (stating that a court "must take care to inquire only whether 'the *protectible elements, standing alone*, are substantially similar' ") (emphasis in original) (citation omitted). After filtering out the unprotectable elements, the Court must then examine the works to determine whether there is a substantial similarity between the protectable elements. Cavalier, 297 F.3d at 822.

***12** Several of the elements alleged by Freebairn to be substantially similar are not protectable elements. For example, as the Court stated supra, the concept of a woman in a kitchen with a jackhammer is not protectable, as concepts are not protectable. Moreover, the element of surprise and incongruity derived from a woman suddenly appearing with a jackhammer to clean the grout of her kitchen tile floor is simply a reiteration of the general concept of the commercial. See Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir. 1994) ("similarities derived from the use of common ideas cannot be protected"). The element of surprise and incongruity is unprotectable for the alternative reason that it is amorphous. See Madrid v. Chronicle Books, 209 F. Supp. 2d 1227, 1241 (D. Wyo. 2002) (noting that "[t]he feel, essence and reaction [by the audience to a work] are likewise unprotectable under copyright law, as they are merely amorphous concepts...."). The same is true for the element of intrigue and mystery and the reference to bright, happy music. Additionally, short phrases, such as "Make it dazzle with Finazzle," are not usually subject to protection. See 37 C.F.R. § 202.1 (stating that "words and short phrases such as names, titles and slogans" are not subject to copyright protection). [4] Further, for the concept of the commercial—a frustrated woman using a jackhammer in her kitchen to clean grout—the apron, the hard hat, the construction work clothes, [5] the woman grabbing a handle as part of the action, and the sound effects featuring the loud, obtrusive sound of a jackhammer are *scenes a faire*, as these elements naturally flow from the concept being depicted. See Herzog, 193 F.3d at 1248 ("[*S]cenes a faire*, 'sequences of events which necessarily follow from a common theme,' are not protectible."); Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C., 199 F. Supp. 2d 1271, 1290 (M.D. Fla. 2001) ("Under the *scenes a faire* doctrine, copyright protection is denied to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting.").

Several other alleged substantially similar elements are not protectable because they are not original. See Kohus v. Mariol, 328 F.3d 848, 855 (6th Cir. 2003) ("The essence of the first step is to filter out the unoriginal, unprotectable [sic] elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity"); Miracle Blade, LLC v. Ebrands Commerce Group, LLC, 207 F. Supp. 2d 1136, 1150 (D. Nev. 2002) ("the doctrine of originality specifies that copyright protection is only afforded to those elements of the work that are original to the author...."). Notably, Freebairn has admitted that television commercials are "generally produced in 15, 30, or 60 second lengths." Freebairn has admitted that it is not unusual for women to wear aprons in kitchens. Freebairn has admitted that the use of a product demonstration in a commercial is not original to Freebairn. Moreover, the product demonstration depicted in the Jackhammer Commercial is the same product demonstration that Finazzle was using in its commercials prior to its relationship with Freebairn, and WSB-TV intentionally mimicked that demonstration when producing the Jackhammer Commercial. Freebairn has admitted that the use of a close-up of the product at the end of a commercial is not original. Finazzle was ending its commercials with a close-up of the product prior to its relationship with Freebairn. The use of a voiceover announcer or "bright, happy music" is not original to Freebairn. Finazzle was using a voiceover announcer, as well as bright, happy music, in its television advertising prior to its relationship with Freebairn.

Still other of the alleged substantially similar elements are actually quite distinct. For example, Freebairn asserts that both works use the same chronology, but the sequence of events in the Jackhammer Storyboard is not the same as the sequence of events in the Jackhammer Commercial. One of the Jackhammer Storyboards begins with a close-up of a beautiful woman in front of a make-up mirror who then puts on safety goggles and hardhat. The other Jackhammer Storyboard opens with a close-up of a beautiful woman who then floats through the house into a kitchen and ties on a pretty apron and reaches for a handle. Both then show the woman jackhammering her kitchen floor. The next two frames show a product demonstration, and both Jackhammer Storyboards end with a bottle sitting on the clean tile floor with the message, "Make it dazzle with Finazzle." In the Jackhammer Commercial, by contrast, the commercial opens with a close-up of a woman's torso as she takes off an apron. The woman then puts on safety goggles, a hard hat, and gloves. The commercial eventually shows a wide-shot of a woman wearing a hardhat,

safety vest, safety goggles, and safety gloves, as she jackhammers her kitchen tile floor. There is then a close-up of the point of the jackhammer at work on the kitchen tile floor and then a medium-shot of the woman using the jackhammer, as tile flies by her head. Following a close-up of the product bottle, there is a product demonstration. The woman is then shown feeling and smelling how clean her kitchen tile floor is after using the product. Finally, there is a close-up of the product bottle sitting on the kitchen counter with three women standing in the background who are drinking wine and noticing how clean the kitchen floor looks. The chronology of events therefore is not as substantially similar as Freebairn argues. Moreover, while Freebairn asserts that the women appear in kitchens with similar figurations, the kitchens are very different. As explained infra in setting forth Finazzle's arguments, the kitchen in the Jackhammer Commercial is much more modern than the kitchen in the Jackhammer Storyboard, although both kitchens have islands at the right of the frame. The Court also agrees with Finazzle that there are substantial differences with respect to the dialogue of the works and the characters in the works. Finally, although Freebairn contends that the works are substantially similar because both show a woman positioned in the same way in cleaning the tile floor, the Jackhammer Commercial only shows a woman's hand in a glove wiping the floor. In the Jackhammer Storyboards, on the other hand, the viewer sees a larger portion of the woman's body, including her feet, one leg, and her arm. Therefore, the works do not both show a woman positioned in the same way in cleaning the tile floor, because the Jackhammer Commercial does not show the woman's position.

***13** Taking away the unprotectable elements of the works mentioned above, there remain only a few similar camera angles, almost all of which are not actually original, as Finazzle demonstrated its product using similar angles in commercials that it produced prior to its relationship with Freebairn. The one arguably similar protectable element is the camera pulling back to reveal the woman on the jackhammer. However, because Freebairn depicts this element only in a storyboard, neither the Court nor a factfinder could determine exactly how Freebairn would have executed the camera pull-back. As such, a finding of substantial similarity is and would be extraordinarily difficult, if not impossible, to make. Further, as "[n]umerous differences [between the works] tend to undercut substantial similarity," Warner Bros., Inc. v. ABD, Inc., 720 F.2d 231, 239 (2d Cir. 1983), and there are numerous differences between the works at issue here, the Court, after independently reviewing the expressive elements of the works, finds that the works are not substantially similar under the extrinsic test. Because a reasonable juror could not differ in weighing the evidence, Finazzle is entitled to summary judgment.

## II. Remaining Motions for Summary Judgment

Finazzle next seeks summary judgment on Freebairn's state law counterclaims and on its own claims pertaining to breach of contract. Freebairn seeks summary judgment on Finazzle's claim for breach of contract.

Finazzle's claim for declaratory judgment of non-breach of contract is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. The Federal Declaratory Judgment Act does not provide an independent basis of federal question jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72, 70 S. Ct. 876, 94 L.Ed. 1194 (1950); Wendy's Int'l, Inc. v. City of Birmingham, 868 F.2d 433, 435 (11th Cir. 1989); Parks v. City of Warner Robbins, 841 F. Supp. 1205, 1209 (M.D. Ga. 1994). Further, the exercise of jurisdiction under the Federal Declaratory Judgment Act is committed to the sound discretion of the federal district courts. See, e.g., Wilton v. Seven Falls Co., 515 U.S. 277, 282-83, 115 S. Ct. 2137, 132 L.Ed. 2d 214 (1995); Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494-95, 62 S. Ct. 1173, 86 L.Ed. 1620 (1942); Employers' Liability Assur. Corp. v. Mitchell, 211 F.2d 441, 443 (5th Cir. 1954). While there is no pending state court action involving Finazzle and Freebairn, as is often the case when a federal district court exercises its discretion to decline jurisdiction over an action for declaratory relief, all of the remaining claims in this case, including the claim for declaratory relief, concern only issues of state law. Dismissing these claims and allowing the parties to pursue them in state court will not harm the parties, as the applicable statutes of limitation have not passed. While there is no evidence that Finazzle engaged in forum shopping in bringing the suit, it does appear from the evidence that Finazzle filed this suit only in anticipation of a lawsuit by Freebairn. In the interest of comity and judicial economy, and having considered all relevant factors, see St. Paul Ins. Co. v. Trejo, 39 F.3d 585, 590-91 (5th Cir. 1994) (setting forth factors that federal district court must consider before exercising its discretion to dismiss a claim for declaratory relief), the Court finds that theses issues of state law would better be resolved in state court. As such, the Court declines to exercise its discretion to decide Finazzle's claim for declaratory judgment of non-breach of contract, and the Court declines to exercise supplemental jurisdiction over the parties' remaining state law claims pursuant to 28 U.S.C. § 1367(c)

(3). See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (noting that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial).

In accordance with the foregoing, the Court denies as moot Defendant Freebairn & Co.'s Motion for Summary Judgment and denies as moot Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on State Law Claims and Counterclaims.

## MOTION FOR RE-ALIGNMENT OF THE PARTIES

***14** The Court likewise denies as moot Defendant Freebairn & Co.'s Motion for Re-Alignment of the Parties.

## CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** the following:

1. Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on Plaintiff's Claim for Declaratory Judgment of Non-Infringement and Defendant's Counterclaim for Copyright Infringement [Doc. No. 44] is **GRANTED**, and the Court **FINDS** and **DECLARES** that Plaintiff Finazzle Corporation USA has not infringed any copyright of Defendant Freebairn & Co. More specifically, the Court **FINDS** and **DECLARES** that the Original Commercials, as defined in the First Amended Complaint, do not infringe any rights Freebairn may own in the storyboards entitled "Jackhammer" and "Laboratories."

2. Count V of Defendant Freebairn & Co.'s Counterclaim is **DISMISSED** with prejudice.

3. Defendant Freebairn & Co.'s Motion for Summary Judgment [Doc. No. 48] is **DENIED as moot**.

4. Defendant Freebairn & Co.'s Motion for Realignment of the Parties [Doc. No. 48] is **DENIED as moot**.

5. Plaintiff Finazzle Corporation USA's Motion for Summary Judgment on State Law Claims and Counterclaims [Doc. No. 52] is **DENIED as moot**.

6. Count III of Plaintiff Finazzle Corporation USA's First Amended Complaint is **DISMISSED** without prejudice, as the Court declines jurisdiction pursuant to its discretion under the Declaratory Judgment Act.

7. Count II of Plaintiff Finazzle Corporation USA's First Amended Complaint and Counts I, II, III, IV, and VI of Defendant Freebairn & Co.'s Counterclaim are **DISMISSED** without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

SO ORDERED this 28th day of September, 2006.

### All Citations

Not Reported in Fed. Supp., 2006 WL 8431790

## Footnotes

1 The parties dispute whether Finazzle overpaid for the services, as Freebairn contends that it is owed agency compensation.

2 Finazzle's First Amended Complaint also seeks a declaration from this Court that commercials produced after its relationship with Freebairn ended do not infringe any rights Freebairn may own in the Laboratories storyboard. Insofar as Freebairn advised at the hearing that it is not making a claim of copyright infringement with respect to the Laboratories storyboard, the Court considers this claim abandoned.

3 Freebairn must also prove that it owns a valid copyright in the Jackhammer Storyboards. See Herzog, 193 F.3d at 1247. For the purpose of this summary judgment motion only, Finazzle does not contest Freebairn's ownership of a valid copyright in the Storyboards.

4 This phrase, in any event, is not original to Freebairn, as Finazzle used the phrase in its other commercials prior to its relationship with Freebairn.

5 The Court notes that the clothing worn by the women at various points in the two works is very different in color and style.

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.